No. 16-50339

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

**UNITED STATES OF AMERICA,**

*Plaintiff-Appellee,*

**v.**

**KEITH PRESTON GARTENLAUB,**

*Defendant-Appellant.*

On Appeal From the United States District Court
For the Central District of California
Case No. SACR 14-173-CAS
The Honorable Christina A. Snyder

## APPELLANT'S MOTION FOR BAIL PENDING APPEAL
## (FILED UNDER SEAL)

Tor Ekeland
TOR EKELAND, P.C.
195 Plymouth St., 5th Floor
Brooklyn, NY  11201
Telephone: (718) 737-7264

John D. Cline
LAW OFFICE OF JOHN D. CLINE
235 Montgomery St., Suite 1070
San Francisco, CA  94104
Telephone: (415) 662-2260

Attorneys for Defendant-Appellant
KEITH PRESTON GARTENLAUB

Appellant Keith Preston Gartenlaub moves under Fed. R. App. P. 9(b), Ninth Cir. R. 9-1.2, and 18 U.S.C. § 3143(b) for an Order permitting him to remain on bail pending appeal. The district court ordered Gartenlaub released on August 29, 2014 on certain conditions. He has complied fully with those conditions. Following sentencing on August 29, 2016, the district court denied Gartenlaub's motion for release pending appeal and directed him to self-surrender by noon on October 31, 2016. Doc. 216 at 4.[1] Under Ninth Cir. R. 9-1.2(e), the filing of this motion stays the district court's surrender order.

## TRANSCRIPT STATUS

The district court's written order denying Gartenlaub's motion for release pending appeal and ordering him to self-surrender on October 31 (Doc. 216 at 4) is attached as Exhibit A. The court's oral ruling on the motion (T.8/29/16 at 62-65) is attached as Exhibit B. All relevant transcripts have been paid for and prepared.

## INTRODUCTION

This is--in the district court's words--a "one-of-a-kind" child pornography case. Exhibit B at 7. Keith Gartenlaub stands convicted of a single count of possession, based on the presence on several computer hard drives of fewer than 100 files containing child pornography. The child pornography files had not been downloaded to any of the hard drives; rather, they had been copied to one of the

---

[1] District court pleadings and orders are cited as "Doc." followed by the docket number. Transcripts are cited as "T.", followed by the date and page.

1

drives in 2005 and then copied (along with thousands of other files as part of an enormous folder with multiple subfolders called "Origdata") from that drive to the next and so on. No one could say who originally downloaded the child pornography files. Three facts are undisputed, however: there is no evidence that anyone opened any of the child pornography files at any point from when they were first copied to one of Gartenlaub's hard drives in 2005 until the government seized the drives in 2014; no new files containing child pornography were added to any of the hard drives after the initial copying in 2005; and numerous people had access to Gartenlaub's computer during the period when the child pornography files were first placed on one of his hard drives.

As the district court recognized at sentencing, Exhibit B at 5-7, the absence of evidence that Gartenlaub originally downloaded the child pornography files, that he added to the child pornography files between 2005 and 2014, or that he ever opened those files sets this case apart from every previous child pornography prosecution. But it is how the government found the child pornography files on Gartenlaub's hard drives in the first place that is the focus of this motion. The government's searches of those hard drives--first secretly under the Foreign Intelligence Surveillance Act and then under a warrant that relied on what the FISA search had found--violated Gartenlaub's Fourth Amendment protection against unreasonable searches and seizures.

## BACKGROUND

### A. The Investigation of Gartenlaub.

In 2012, Wesley Harris, an FBI agent in Los Angeles, read an article from Wired.com noting that the Chinese had developed a military transport plane "in roughly the same class as the U.S. C-17 or the Russian Il-76." Doc. 73, Exhibit C, Affidavit at 8 (affidavit attached as Exhibit C). The article asserted that the Russian Il-76 "seems to be the basis of the Y-20's design," but added that "'Beijing may also have acquired some of the C-17's blueprints from a spy working at Boeing." Exhibit C at 9.[2] The agent read a second article, which asserted that "hackers" may have compromised the Boeing C-17 and other Boeing aircraft. *Id*.

Based on these articles, Agent Harris launched an investigation that swiftly focused on Gartenlaub, who worked at Boeing. There was never a shred of evidence that Gartenlaub had provided C-17 information to China. There was no such evidence in 2012, and there is none today. But Agent Harris fixated on two principal facts: that Gartenlaub's position at Boeing allegedly gave him access to C-17 data and that his wife is Chinese, which means that he has traveled to China,

---

[2] A previous version of the Wired.com article, published in December 2012, identified the potential Boeing spy as Dongfan Chung. https://www.wired.com/2012/12/china-debuts-giant-transport/. Chung was convicted in 2010 of providing Boeing trade secrets to China (although the conviction did not involve the C-17), and this Court affirmed in 2011. *United States v. Chung*, 659 F.3d 815 (9th Cir. 2011). The Harris affidavit does not mention Chung.

communicated with people in China, and owned property in China. No matter that Gartenlaub disclosed his Chinese travel to Boeing and received approval. No matter that his communications with China had nothing to do with the C-17 and were easily explained by his family relationship. No matter that many others had access to the C-17 data. No matter that there was not a shred of evidence anywhere that Gartenlaub had taken C-17 data from Boeing and delivered it to the Chinese. No matter the many other facts refuting the "Gartenlaub as spy" theory. Agent Harris seized on Gartenlaub's alleged access (which the agent misunderstood and exaggerated), his Chinese wife, and other innocuous facts to construct a fictitious picture of Gartenlaub as a spy for China.

In June 2013, Agent Harris took his theory to a Magistrate Judge in Los Angeles and obtained a search warrant for Gartenlaub's and his wife's personal email accounts. As discussed below, the affidavit in support of the warrant does not come close to establishing probable cause that the emails contain evidence that Gartenlaub spied for China. The Harris affidavit is, in any event, rife with material falsehoods and omissions.

The emails, once produced in response to the warrant, provided no support for Agent Harris' theory. Undeterred, the FBI turned to the Foreign Intelligence Surveillance Court. Based on a secret submission which has never been disclosed to the defense--but which presumably sought to establish probable cause to believe

that Gartenlaub was an "agent of a foreign power," namely China--the FISC authorized a search of Gartenlaub's home and computers. On January 29 and 30, 2014, agents conducted the secret search and imaged three hard drives they found in the home. Over the following months, agents pored through the massive amount of data they had obtained. The FBI found no evidence (because there is none) that Gartenlaub had provided C-17 data to China or otherwise acted as a spy for China. But the agents *did* find, among the thousands of files on the hard drives, a handful containing child pornography.

The agents dropped the theory that Gartenlaub was a spy for China and embraced instead the theory that he collected child pornography. In August 2014, the FBI obtained a search warrant for premises associated with Gartenlaub, seeking evidence that he received and possessed child pornography. Doc. 73, Exhibit A. The application for the August 2014 warrant relied heavily on the fact that the secret FISA search from January 2014 (described in the warrant application as "a court-authorized search without notice" to the occupants) had found child pornography on hard drives associated with Gartenlaub. *Id*. at 5-6. The FBI search led to the seizure of three hard drives that the FBI had imaged during the FISA search, plus a fourth that contained a copy of the "Origdata" folder structure, including the files with child pornography.

### B. Proceedings in the District Court.

On October 23, 2014, the grand jury indicted Gartenlaub for receipt and possession of child pornography. Through pretrial motions, he challenged the January 2014 FISA search and the August 2014 search on Fourth Amendment and other grounds. He sought disclosure of the underlying FISA application and order, and he requested a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), at which he could establish that the FISA application and the August 2014 search warrant application contained intentional or reckless material falsehoods and omissions. Docs. 67, 70, 73.

The government submitted a largely classified, ex parte opposition to Gartenlaub's FISA motion.[3] The district court reviewed the FISA application and order, together with the classified portions of the government's opposition, in camera and ex parte. In an 11-page opinion drafted by the government and signed without change by the district court, the court refused to disclose to the defense the FISA application and order and denied Gartenlaub's motion to suppress the fruits of the FISA search. Doc. 114. Later, however, the court expressed some misgivings; it declared, "I do have some personal questions regarding the propriety of the FISA court proceeding even though that certainly seems to be legally

---

[3] The defense received a heavily redacted version of the government's opposition. Doc. 82.

authorized." T.4/18/16 at 9-10. The court also denied Gartenlaub's motion to suppress the evidence obtained through the August 2014 searches. Doc. 115.

The evidence at trial showed that in 2005 fewer than 100 files containing child pornography were copied to a hard drive found later in Gartenlaub's possession; that no new child pornography files were added after that date; that there was no evidence showing who initially downloaded the child pornography files, or to what hard drive; that the child pornography files were copied--along with thousands of other files in the folder structure called "Origdata"--to three other hard drives found in Gartenlaub's possession; and that there was no evidence that Gartenlaub or anyone else opened the files containing child pornography at any point from 2005 when they were first copied to one of the hard drives until the hard drives were seized in 2014. *See generally* T.12/9/15 at 332-380. The evidence also showed that a number of other people had access to Gartenlaub's computer during the period when the child pornography files were first copied to his hard drive. T.12/9/15 at 403-05, 412-16, 421-23.

The jury found Gartenlaub guilty on both counts. The district court dismissed the receipt count (Count 1) as multiplicitous. Doc. 210. On August 29, 2016, the court sentenced Gartenlaub to 41 months imprisonment and $3430 in restitution. Doc. 216. It denied his oral motion for release pending appeal. Exhibits A and B.

## ARGUMENT

## I.    LEGAL PRINCIPLES.

A court must release a defendant pending appeal if it makes four findings: (1) "the defendant is not likely to flee or pose a danger to the safety of any other person in the community if released," (2) "the appeal is not for purpose of delay," (3) "the appeal raises a substantial question of law or fact," and (4) "if that substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed." *United States v. Handy*, 761 F.2d 1279, 1283 (9th Cir. 1985) (quotation omitted); *see* 18 U.S.C. § 3143(b)(1).

## II.    FLIGHT AND DANGER.

The first *Handy* factor clearly favors Gartenlaub; as the district court expressly determined in releasing him pending sentencing, T.12/10/15 at 58-60 (attached as Exhibit D), and again implicitly in permitting self-surrender, he is not likely to flee and he does not pose a danger to the community. Gartenlaub complied fully with his conditions of release, and he has made every pretrial, trial, and post-trial appearance.

## III.   DELAY.

Gartenlaub has not appealed for purposes of delay. He has retained appellate counsel; he has ordered and obtained all transcripts; and he expects to file

his opening brief on schedule and without extensions. Because most of the significant pleadings are sealed in the district court, appellate counsel only recently obtained them, subject to a protective order that the district court entered a few days ago. But that obstacle has been overcome, and counsel know of no reason why the case cannot proceed on schedule.

## IV.  SUBSTANTIAL QUESTION LIKELY TO RESULT IN REVERSAL.

The third and fourth *Handy* factors--whether Gartenlaub's appeal presents "a substantial question of law or fact" that, if resolved in his favor, is "likely to result in reversal or an order for a new trial of all counts"--are the key to the bail decision. According to this Court, "a substantial question is one that is fairly debatable," or "one of more substance than would be necessary to a finding that it was not frivolous." *Handy*, 761 F.2d at 1283 (quotations omitted); *see, e.g., United States v. Garcia*, 340 F.3d 1013, 1020 n.5 (9th Cir. 2003).

The January and August 2014 searches of Gartenlaub's hard drives, both of which rested directly or derivatively on the theory that Gartenlaub had provided C-17 data to China, form the heart of this motion.[4] The legality of those searches presents Fourth Amendment issues that are, at a minimum, "fairly debatable" and

---

[4] The August 2014 search violated the Fourth Amendment primarily because it was derived from the unlawful January 2014 FISA search. For that reason, we focus here on the January 2014 search. To be clear, we expect the appeal to raise significant issues in addition to those described here--but these issues suffice to show that the appeal presents "fairly debatable" questions that, if resolved in Gartenlaub's favor, are likely to result in reversal.

"not frivolous."  And if those issues are decided in his favor, the evidence of child pornography will be suppressed and his conviction will be reversed.

**A.      The Fourth Amendment Implications of Computer Searches.**

The analysis of the government's searches of Gartenlaub's hard drives begins with the principle that computers enjoy heightened protection under the Fourth Amendment, because of the extraordinary volume of intensely personal information they contain.  The Supreme Court's unanimous opinion in *Riley v. California*, 134 S. Ct. 2473 (2014), summarized the profound privacy concerns of a cell phone (and, by the same logic, other modern computers):

> The storage capacity of cell phones has several interrelated consequences for privacy.  First, a cell phone collects in one place many distinct types of information--an address, a note, a prescription, a bank statement, a video--that reveal much more in combination than any isolated record.  Second, a cell phone's capacity allows even just one type of information to convey far more than previously possible. The sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions; the same cannot be said of a photograph or two of loved ones tucked into a wallet.  Third, the data on a phone can date back to the purchase of the phone, or even earlier.  A person might carry in his pocket a slip of paper reminding him to call Mr. Jones; he would not carry a record of all his communications with Mr. Jones for the past several months, as would routinely be kept on a phone.

*Id*. at 2489.  The Court observed that the data on a cell phone (or any other computer) differs from physical records qualitatively as well as by quantity.  As the Court found, "a cell phone search would typically expose to the government far *more* than the most exhaustive search of a house: A phone not only contains in

digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form--unless the phone is." *Id*. at 2491 (emphasis in original).

This Court as well has emphasized the privacy concerns that computer searches implicate. In *United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013) (en banc), for example, the Court observed:

> Laptop computers, iPads and the like are simultaneously offices and personal diaries. They contain the most intimate details of our lives: financial records, confidential business documents, medical records and private emails. This type of material implicates the Fourth Amendment's specific guarantee of the people's right to be secure in their "papers." U.S. Const. amend. IV. The express listing of papers reflects the Founders' deep concern with safeguarding the privacy of thoughts and ideas--what we might call freedom of conscience--from invasion by the government.

*Id*. at 964. The Court added that "[e]lectronic devices often retain sensitive and confidential information far beyond the perceived point of erasure, notably in the form of browsing histories and records of deleted files." *Id*. at 965; *see United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1176 (9th Cir. 2010) (en banc) (noting the "serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant").

This case powerfully implicates the privacy concerns that *Riley* and *Cotterman* highlight. Based on the entirely speculative theory that Gartenlaub was

a spy for China, government agents secretly entered his home, imaged his computer hard drives, and then spent months rummaging through the electronic data looking for evidence of wrongdoing. They did not find what they were looking for--evidence that Gartenlaub was a spy for China--but among the thousands of files they found a handful containing child pornography and thus launched this prosecution. For the reasons outlined below--and to be more fully developed in Gartenlaub's opening brief--that course of action violated his Fourth Amendment rights.

**B.     The January 2014 Search Was Not Supported By Probable Cause.**

The government's application to the FISC for an order authorizing the January 2014 search of Gartenlaub's home and computers was required to include "a statement of the facts and circumstances relied upon by the applicant to justify the applicant's belief that . . . the target of the physical search [Gartenlaub] is . . . an agent of a foreign power."[5]  In turn, the FISC was required to find "probable cause to believe that . . . [Gartenlaub] is . . . an agent of a foreign power."[6]

An "agent of a foreign power," as applied to a "United States person" such as Gartenlaub, means (as potentially relevant here) "any person who knowingly engages in clandestine intelligence gathering activities for or on behalf of a foreign

---

[5] 50 U.S.C. § 1823(a)(3)(A); *see United States v. Posey*, 864 F.2d 1487, 1490 (9th Cir. 1989).

[6] 50 U.S.C. § 1824(a)(2)(A).

power, which activities involve or may involve a violation of the criminal statutes of the United States," and "any person who knowingly aids or abets [or conspires with] any person in the conduct of activities" described above.[7]

The government's application to the FISC to search Gartenlaub's home and computers--to the extent it was accurate and did not omit material facts--did not establish probable cause to believe that he was an "agent of a foreign power." There is no evidence that Gartenlaub acted "for or on behalf of" China, the relevant "foreign power." As the Senate Judiciary Committee explained, "Under this standard the person to be [searched] must be shown to have a knowing and substantial connection with the foreign power for whom he is working. There must be a principal-agent relationship under which the alleged agent has undertaken to provide services for his foreign principal." S. Rep. 95-604(I), 95th Cong., 1st Sess. 22, *reprinted in* 1978 U.S.C.C.A.N. 3904, 3923. No evidence supports the theory that Gartenlaub had a "knowing and substantial connection" or a "principal-agent relationship" with the Chinese government.

Of course, the defense has been denied access to the government's application to the FISC, so we cannot address its specific allegations. But that application likely recycled the "Gartenlaub as spy" theory that Agent Harris presented in June 2013 in his affidavit in support of the warrant for Gartenlaub's

---

[7] 50 U.S.C. § 1801(b)(2)(A), (E) (ellipses omitted; emphasis added); *see id.* § 1821(1).

emails.  The Harris affidavit falls far short of establishing probable cause to believe that Gartenlaub was a spy for China.  To begin with, the affidavit's premise--that someone at Boeing provided information concerning the C-17 to China--rests on two magazine articles (from Wired.com and aionline.com).  Exhibit C at 8-9.  But neither article supports that theory.  The Wired.com article asserted that the Russian Il-76 "seems to be the basis of the Y-20's design," but added that "'Beijing may also have acquired some of the C-17's blueprints from a spy working at Boeing."  Exhibit C at 9.  That speculation--"may also have acquired some of the C-17's blueprints from a spy working at Boeing"--hardly amounts to probable cause.  The aionline.com article provides even less support for Agent Harris' theory; that article asserted that "hackers"--not an internal Boeing spy--may have compromised the Boeing C-17 and other Boeing aircraft.  *Id*.[8]

The Harris affidavit is no more compelling when it turns specifically to Gartenlaub.  The affidavit lacks *any* evidence--because there is none--that Gartenlaub removed C-17 information from Boeing's internal computer network and provided that information to the Chinese government.

---

[8] Indeed, in 2014 the government alleged that a Canadian businessman, Su Bin, hacked into the Boeing computer system and stole military information, likely including information about the C-17.  Doc. 73 at 22-24 (describing Su Bin case and attaching government affidavit in support of complaint in that case).  Su Bin's hacking, of course, had nothing to do with Gartenlaub.

Lacking any such evidence, the Harris affidavit resorts to innuendo. For example, the affidavit recites various innocuous statements that Gartenlaub made to the agents--about his interactions with Boeing security when traveling to China, about the difficulty of working on classified projects with an uncleared supervisor, and so on--and then asserts, based on Agent Harris' "experiences and training as an FBI agent" and without further explanation, that those statements are "suspicious in nature." Exhibit C at 18-21. The affidavit notes that, during the period when the interviews were occurring, Gartenlaub received two emails from a Boeing employee "stating that there were over 900 part files missing on the C-17 SAN, or Storage Area Network," but did not report the email to the FBI agents when they interviewed him several days later. *Id*. at 18, 20, 33. But the affidavit makes no effort to connect the allegedly missing part files to Gartenlaub, or to the Chinese government, or to the new Chinese airplane. It merely notes that Agent Harris had requested additional information from Boeing on the subject and leaves the matter hanging. *Id*. at 34.

The Harris affidavit relies upon the comments of an unnamed Boeing project security officer. The officer told Agent Harris that his "impression" was that Gartenlaub "always felt he was above the rules." He told Agent Harris that Gartenlaub's wife was from China and they would "travel there to visit family." At one point, according to the officer, the rules changed, and Gartenlaub was told he

15

could not make a trip to China for which he had already bought tickets. According to the officer, "Gartenlaub told us that he canceled the trip but I always suspected he went anyway, but had no proof." *Id*. at 21-22.[9] The unnamed security officer added that "nobody trusted [Gartenlaub]" and that "his transfer off of a sensitive project and onto the C-17 was the C-17's loss and the sensitive project's gain." *Id*. at 22. It is remarkable that an American's privacy can be breached, and his home and computers secretly ransacked, based on this sort of vague character assassination.

Agent Harris devotes several pages of his affidavit to the so-called "Fish Fork" email. This was an email that Gartenlaub's wife forwarded to him at his Boeing email address, to which he did not respond. *Id*. at 25-27. We note below the misleading omissions in Agent Harris' description of the email. But even as portrayed in the affidavit, the email has nothing to do with the C-17 or confidential Boeing information and reveals no wrongdoing by Gartenlaub.

Agent Harris describes a photo that Gartenlaub's wife sent to him in May 2013 (in other words, after the FBI had interviewed Gartenlaub repeatedly about

---

[9] Agent Harris notes that, according to a "government database showing U.S. border crossings," there is no evidence of Gartenlaub taking the trip in question. In other words, Gartenlaub told the security officer the truth, and the officer's suspicion was unfounded--which makes one wonder why Agent Harris included it in the first place. Exhibit C at 22. Agent Harris also notes that Gartenlaub properly and accurately reported to Boeing security all of his international travel, including his travel to China, with the possible exception of one entry into the United States from Canada in September 2008. *Id*. at 22-25.

the C-17) at his Boeing email address. The photo (included in the affidavit) depicts Gartenlaub and his wife. He is wearing "a white collared shirt, red scarf, red arm sash with Chinese characters, and a black cross-body strap." *Id.* at 35. Gartenlaub's wife is dressed similarly, and, Agent Harris notes, "[b]oth . . . are smiling." *Id.* Based on "open source materials" that Agent Harris reviewed, he concludes that Gartenlaub is wearing the "typical dress uniform[] of the Young Pioneers of China," which is "worn by children commemorating various nationalistic holidays in the PRC." *Id.* at 35-36. The reader is left to surmise the significance of the adult Gartenlaub purportedly wearing the uniform of "children commemorating various nationalistic holidays" in China.

Agent Harris next turns to his "financial investigation." *Id.* at 37. He notes that Gartenlaub and his wife have accounts at various financial institutions and that, over a three-year period between August 2009 and December 2012, they made 61 ATM deposits into their Bank of America account totaling $58,628.26. They made additional, non-ATM deposits, including a $25,000 wire transfer from the Industrial Bank of China (where his wife had an account) into their joint Bank of America account. *Id.* at 37. Without a shred of supporting evidence (and without even a rudimentary follow-up investigation), Agent Harris concludes: "FBI LA believes that Gartenlaub and [his wife] were compensated for assisting in the intrusion [into Boeing's computer network] via cash payments. FBILA

believes Gartenlaub and [his wife] have been slowly depositing the cash into multiple bank accounts and transferring the money to other accounts in order to hide the source of the funds." *Id*. Agent Harris does not explain why a spy receiving secret payments from China would deposit cash in a U.S. account, held in his own name, where it could easily be found. And he does not offer a shred of evidence showing that the money in question actually came from the Chinese government, or had anything to do with the alleged theft of Boeing data. The remainder of Agent Harris' "financial investigation" rests on similar speculation and innuendo. *Id*. at 37-39.

Agent Harris' summary of the information purportedly linking Gartenlaub to a possible compromise of C-17 information--largely a rehash of the information discussed above--appears at pages 42-46 of his affidavit. That information, even taken at face value (which it cannot be, for reasons outlined below), falls far short of providing probable cause that Gartenlaub was a spy for China. The application to the FISC for an order authorizing the search of Gartenlaub's home and computers very likely relied on much of the same unfounded innuendo and speculation. We have not seen that application, of course, because the district court refused to disclose it to the defense (another issue for appeal)--but, to the extent it was truthful, it could not have established probable cause to believe that Gartenlaub was an "agent of a foreign power." At a minimum, this issue presents a

substantial question--and, if decided in Gartenlaub's favor, it will likely result in reversal of his conviction.

**C.     The District Court Should Have Conducted a *Franks* Hearing.**

Under *Franks v. Delaware*, 438 U.S. 154 (1978), a court must hold an evidentiary hearing on the veracity of a warrant affidavit if the defendant makes a "substantial preliminary showing" that the affidavit contains intentional or reckless false statements or omissions and that the false or omitted information was material to the probable cause finding. *See id*. at 155-56. Courts have repeatedly recognized that *Franks* applies to FISA applications. *See United States v. Daoud*, 755 F.3d 479, 489 (7th Cir. 2014) (Rovner, J., concurring) (collecting cases), *cert. denied*, 135 S. Ct. 1456 (2015).

The defense could not address the allegations contained in the January 2014 FISA application, to which it was denied access, but it identified an astonishing array of material falsehoods and omissions in the June 2013 Harris affidavit, covering virtually every aspect of Agent Harris' "Gartenlaub as spy" theory. Doc. 73 at 18-34. To cite a few examples, Agent Harris misstated Gartenlaub's access to the relevant Boeing documents, Doc. 73 at 27-30; omitted information concerning the Boeing employee's emails about "missing" files, Doc. 73 at 30-31; omitted information concerning Gartenlaub's finances that, if included, would have refuted the sinister innuendo that Agent Harris sought to foster, Doc. 73 at 31-33; and

omitted exculpatory information concerning the so-called "Fish Fork" email that Gartenlaub's wife forwarded to him, including the actual email--which contains a photograph showing that the supposedly sensitive parts in question consist of a carriage bolt and a bracket, Doc. 73 at 34. It seems highly likely that the government's FISA application, submitted just a few months after the Harris affidavit, reflects at least some of the same material falsehoods and omissions and possibly others. The *Franks* issue presents, at a minimum, a substantial question on appeal.

## CONCLUSION

For the foregoing reasons, the Court should permit Gartenlaub to remain on release pending appeal.

DATED: October 28, 2016         Respectfully submitted,


              /s/ John D. Cline
        John D. Cline


        Attorney for Defendant-Appellant
        KEITH PRESTON GARTENLAUB

# CERTIFICATE OF SERVICE

## When All Case Participants Are Registered For
## The Appellate CM/ECF System

U.S. Court of Appeals Docket Number 16-50339

I hereby certify that on the 28th day of October, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. In addition, because this motion and the attachments are at least temporarily sealed, I emailed a copy to counsel for the United States.

      /s/   John D. Cline
      John D. Cline

## DECLARATION OF JOHN D. CLINE

1.      My name is John D. Cline.  I am counsel of record for appellant Keith Preston Gartenlaub.  I am over the age of eighteen and competent to make this declaration.  I submit this declaration in support of appellant Gartenlaub's motion for release pending appeal.

2.      Attached as Exhibit A is a true and correct copy of the judgment in this case, district court docket No. 216.

3.      Attached as Exhibit B is a true and correct copy of selected pages from the August 29, 2016 sentencing transcript.

4.      Attached as Exhibit C is a true and correct copy of the June 18, 2013 affidavit of FBI Special Agent Wesley Harris in support of an application for a search warrant for Gartenlaub's personal emails.  The affidavit constitutes a portion of Exhibit C to district court docket No. 73, Gartenlaub's motion to traverse certain search warrants.  The affidavit is under seal in the district court.

5.      Attached as Exhibit D is a true and correct copy of selected pages from the December 10, 2015 trial transcript.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 28th day of October, 2016.

<div align="right">

/s/  John D. Cline

John D. Cline
</div>

# EXHIBIT A

## United States District Court
## Central District of California

**UNITED STATES OF AMERICA vs.**          **Docket No.**          <u>SACR14-173-CAS</u>

**Defendant**    <u>KEITH PRESTON GARTENLAUB</u>          **Social Security No.** <u>9</u>   <u>4</u>   <u>2</u>   <u>9</u>

akas:  <u>N/A</u>          (Last 4 digits)

<div style="background:black;color:white;text-align:center">

**JUDGMENT AND PROBATION/COMMITMENT ORDER**

</div>

|  | MONTH | DAY | YEAR |
|---|---|---|---|
| In the presence of the attorney for the government, the defendant appeared in person on this date. | **08** | **29** | **2016** |

| **COUNSEL** | **Mark Werksman, Retained** |
|---|---|
| | (Name of Counsel) |

**PLEA** ☐ **GUILTY,** and the court being satisfied that there is a factual basis for the plea. ☐ **NOLO CONTENDERE** ☐ **NOT GUILTY**

**FINDING**  There being a finding/verdict of **GUILTY,** defendant has been convicted as charged of the offense(s) of:
Possession of Child Pornography in violation of 18 U.S.C. § 2252A(a)(5)(B), 2252a(b)(2), as charged in Count 2 of the Indictment.

**JUDGMENT AND PROB/ COMM ORDER**  The Court asked whether there was any reason why judgment should not be pronounced.  Because no sufficient cause to the contrary was shown, or appeared to the Court, the Court adjudged the defendant guilty as charged and convicted and ordered that: Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant is hereby committed to Count 2 of the 2-Count Indictment to the custody of the Bureau of Prisons to be imprisoned for a term of: **FORTY-ONE (41) MONTHS.**

It is ordered that the defendant shall pay to the United States a special assessment of $100.00, which is due immediately. Any unpaid balance shall be due during the period of imprisonment, at the rate of not less than $25.00 per quarter, and pursuant to the Bureau of Prisons' Inmate Financial Responsibility Program.

The defendant shall comply with General Order No. 01-05.

All fines are waived as it is found that such sanction would place an undue burden on the defendant's dependent.

It is ordered that the defendant shall pay restitution in the total amount of $3,430.00, pursuant to 18 U.S.C. § 3663A.

The amount of restitution ordered shall be paid to the victim as set forth in a separate victim list prepared by the probation office which this Court adopts and which reflects the Court's determination of the amount of restitution due to each victim.  The victim list, which shall be forwarded to the fiscal section of the clerk's office, shall remain confidential to protect the privacy interests of the victim.

Restitution shall be due during the period of imprisonment, at the rate of not less than $25.00 per quarter, and pursuant to the Bureau of Prisons' Inmate Financial Responsibility Program.  If any amount of the restitution remains unpaid after release from custody, nominal monthly payments of at least $100.00 or ten percent of the defendant's gross monthly income, whichever is greater, shall be made during the period of supervised release.  These payments shall begin 30 days after the commencement of supervision. Nominal restitution payments are ordered as the Court finds that the defendant's economic circumstances do not allow for either immediate or future payment of the amount ordered.

Pursuant to 18 U.S.C. § 3612(f)(3)(A), interest on the restitution ordered is waived because the defendant

does not have the ability to pay interest. Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of life under the following terms and conditions:

1. The defendant shall comply with the rules and regulations of the United States Probation Office, General Order 05-02, and General Order 01-05, including the three special conditions delineated in General Order 01-05;

2. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one (1) drug test within 15 days of release from imprisonment and at and at least two (2) periodic drug tests thereafter, not to exceed eight (8) tests per month, as directed by the Probation Officer;

3. As directed by the Probation Officer, the defendant shall pay all or part of the costs of the defendant's mental health treatment to the aftercare contractors during the period of community supervision, pursuant to 18 U.S.C. § 3672. The defendant shall provide payment and proof of payment as directed by the Probation Officer;

4. During the period of community supervision, the defendant shall pay the special assessment in accordance with this judgment's orders pertaining to such payment;

5. The defendant shall cooperate in the collection of a DNA sample from the defendant;

6. The defendant shall possess and use only those computers and computer-related devices, screen user names, passwords, email accounts, and internet service providers (ISPs) that have been disclosed to the Probation Officer upon commencement of supervision. Any changes or additions are to be disclosed to the Probation Officer prior to the first use. Computers and computer-related devices include personal computers, personal data assistants (PDAs), internet appliances, electronic games, cellular telephones, and digital storage media, as well as their peripheral equipment, that can access, or can be modified to access, the internet, electronic bulletin boards, and other computers;

7. All computers, computer-related devices, and their peripheral equipment, used by the defendant shall be subject to search and seizure. This shall not apply to items used at the employment's site, which are maintained and monitored by the employer;

8. The defendant shall comply with the rules and regulations of the Computer Monitoring Program. The defendant shall pay the cost of the Computer Monitoring Program, in an amount not to exceed $32.00 per month per device connected to the internet

9. The defendant shall register as a sex offender, and keep the registration current, in each jurisdiction where he resides, where he is an employee, and where he is a student, to the extent the registration procedures have been established in each jurisdiction. When registering for the first time, the defendant shall also register in the jurisdiction in which the conviction occurred if different from his jurisdiction of residence. The defendant shall provide proof of registration to the Probation Officer within three days of release from imprisonment;

10. The defendant shall participate in a psychological counseling or psychiatric treatment or a sex offender treatment program, as approved and directed by the Probation Officer. The defendant shall abide by all rules, requirements, and conditions of such program;

11. The defendant shall not view or possess any materials, including pictures, photographs, books, writings, drawings, videos, or video games depicting and/or describing "sexually explicit conduct", as defined at 18 U.S.C. § 2256(2);

12. The defendant shall not view or possess any materials, including pictures, photographs, books, writings, drawings, videos, or video games depicting and/or describing child pornography, as defined at 18 U.S.C. § 2256(8). This condition does not prohibit the defendant from possessing materials solely because they are necessary to, and used for, a collateral attack, nor does it prohibit him from possessing materials prepared and used for the purposes of his Court-mandated sex offender treatment, when the defendant's treatment provider or the probation officer has approved of his possession of the materials in advance;

13. The defendant shall not own, use or have access to the services of any commercial mail-receiving agency, nor shall he open or maintain a post office box, without the prior written approval of the Probation Officer;

14. The defendant shall not frequent, or loiter, within 100 feet of school yards, parks, public swimming pools, playgrounds, youth centers, video arcade facilities, or other places primarily used by persons under the age of 18, unless the defendant receives written permission from the Probation Officer;

15. The defendant shall not associate or have verbal, written, telephonic, or electronic communication with any person under the age of 18, except: (a) in the presence of the parent or legal guardian of said minor; and (b) on the condition that the defendant notify said parent or legal guardian of his conviction in the instant offense. This provision does not encompass persons under the age of 18, such as waiters, cashiers, ticket vendors, etc., whom the defendant must interact with in order to obtain ordinary and usual commercial services;

16. The defendant shall not affiliate with, own, control, volunteer or be employed in any capacity by a business and/or organization that causes the defendant to regularly contact persons under the age of 18;

17. The defendant shall not affiliate with, own, control, or be employed in any capacity by a business whose principal product is the production or selling of materials depicting or describing "sexually explicit conduct," as defined at 18 U.S.C. § 2256(2);

18. The defendant's employment shall be approved by the Probation Officer, and any change in employment must be pre-approved by the Probation Officer. The defendant shall submit the name and address of the proposed employer to the Probation Officer at least ten days prior to any scheduled change; and

19. The defendant shall submit his person, and any property, house, residence, vehicle, papers, computer, other electronic communication or data storage devices or media, and effects to search at any time, with or without warrant, by any law enforcement or Probation Officer with reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct by the defendant, and by any Probation Officer in the lawful discharge of the officer's supervision function.

The Court authorizes the Probation Office to disclose the Presentence Report to the substance abuse treatment provider to facilitate the defendant's treatment for narcotic addiction or drug dependency. Further redisclosure of the Presentence Report by the treatment provider is prohibited without the consent of the sentencing judge.

The Court further authorizes the Probation Officer to disclose the Presentence Report, and/or any previous mental health evaluations or reports, to the mental health treatment provider. The treatment provider may provide information (excluding the Presentence report), to State or local social service agencies (such as the State of California, Department of Social Service), for the purpose of the client's rehabilitation.

It is further ordered that the defendant surrender himself to the institution designated by the Bureau of Prisons at or before 12 noon, October 31, 2016. In the absence of such designation, the defendant shall report on or before the same date and time, to the United States Marshal located at United States District Court, 3470 Twelfth Street, Room G122, Riverside, CA 92501.

Defendant is informed of his right to appeal.

Bond is exonerated upon surrender.

The Court hereby recommends that defendant be designated to a facility in Southern California, or as close thereto as possible.

The Court further recommends that defendant be placed in the Bureau of Prisons 500-hour Drug and Alcohol Program, if eligible.

Defendant's oral motion to remain on bond pending appeal is hereby denied.

In addition to the special conditions of supervision imposed above, it is hereby ordered that the Standard Conditions of Probation and Supervised Release within this judgment be imposed.  The Court may change the conditions of supervision, reduce or extend the period of supervision, and at any time during the supervision period or within the maximum period permitted by law, may issue a warrant and revoke supervision for a violation occurring during the supervision period.

September 6, 2016

_Christine A. Snyder_

Date                                                        Christina A. Snyder, U. S. District Judge

It is ordered that the Clerk deliver a copy of this Judgment and Probation/Commitment Order to the U.S. Marshal or other qualified officer.

Clerk, U.S. District Court

September 6, 2016                        By                    /S/

Filed Date                                                  C. Jeang, Deputy Clerk

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below).
## STANDARD CONDITIONS OF PROBATION AND SUPERVISED RELEASE
While the defendant is on probation or supervised release pursuant to this judgment:

1. The defendant shall not commit another Federal, state or local crime;
2. the defendant shall not leave the judicial district without the written permission of the court or probation officer;
3. the defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;
4. the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
5. the defendant shall support his or her dependents and meet other family responsibilities;
6. the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;
7. the defendant shall notify the probation officer at least 10 days prior to any change in residence or employment;
8. the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician;
9. the defendant shall not frequent places where controlled substances are illegally sold, used, distributed or administered;
10. the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
11. the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;
12. the defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer;
13. the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
14. as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to conform the defendant's compliance with such notification requirement;
15. the defendant shall, upon release from any period of custody, report to the probation officer within 72 hours;
16. and, for felony cases only: not possess a firearm, destructive device, or any other dangerous weapon.

☐   The defendant will also comply with the following special conditions pursuant to General Order 01-05 (set forth below).

## STATUTORY PROVISIONS PERTAINING TO PAYMENT AND COLLECTION OF FINANCIAL SANCTIONS

The defendant shall pay interest on a fine or restitution of more than $2,500, unless the court waives interest or unless the fine or restitution is paid in full before the fifteenth (15th) day after the date of the judgment pursuant to 18 U.S.C. §3612(f)(1). Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. §3612(g).  Interest and penalties pertaining to restitution, however, are not applicable for offenses completed prior to April 24, 1996.

If all or any portion of a fine or restitution ordered remains unpaid after the termination of supervision, the defendant shall pay the balance as directed by the United States Attorney's Office.  18 U.S.C. §3613.

The defendant shall notify the United States Attorney within thirty (30) days of any change in the defendant's mailing address or residence until all fines, restitution, costs, and special assessments are paid in full.  18 U.S.C. §3612(b)(1)(F).

The defendant shall notify the Court through the Probation Office, and notify the United States Attorney of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay a fine or restitution, as required by 18 U.S.C. §3664(k).  The Court may also accept such notification from the government or the victim, and may, on its own motion or that of a party or the victim, adjust the manner of payment of a fine or restitution-pursuant to 18 U.S.C. §3664(k).  See also 18 U.S.C. §3572(d)(3) and for probation 18 U.S.C. §3563(a)(7).

Payments shall be applied in the following order:
1. Special assessments pursuant to 18 U.S.C. §3013;
2. Restitution, in this sequence (pursuant to 18 U.S.C. § 3664(i), all non-federal victims must be paid before the United States is paid):
   Non-federal victims (individual and corporate),
   Providers of compensation to non-federal victims,
   The United States as victim;
3. Fine;
4. Community restitution, pursuant to 18 U.S.C. §3663(c); and
5. Other penalties and costs.

## SPECIAL CONDITIONS FOR PROBATION AND SUPERVISED RELEASE

As directed by the Probation Officer, the defendant shall provide to the Probation Officer: (1) a signed release authorizing credit report inquiries; (2) federal and state income tax returns or a signed release authorizing their disclosure; and (3) an accurate financial statement, with supporting documentation as to all assets, income and expenses of the defendant.  In addition, the defendant shall not apply for any loan or open any line of credit without prior approval of the Probation Officer.

The defendant shall maintain one personal checking account.  All of defendant's income, "monetary gains," or other pecuniary proceeds shall be deposited into this account, which shall be used for payment of all personal expenses.  Records of all other bank accounts, including any business accounts, shall be disclosed to the Probation Officer upon request.

The defendant shall not transfer, sell, give away, or otherwise convey any asset with a fair market value in excess of $500 without approval of the Probation Officer until all financial obligations imposed by the Court have been satisfied in full.

These conditions are in addition to any other conditions imposed by this judgment.

**RETURN**

I have executed the within Judgment and Commitment as follows:

Defendant delivered on _____ to _____

Defendant noted on appeal on _____

Defendant released on _____

Mandate issued on _____

Defendant's appeal determined on _____

Defendant delivered on _____ to _____

at _____

the institution designated by the Bureau of Prisons, with a certified copy of the within Judgment and Commitment.

United States Marshal

By _____

| _____ | Deputy Marshal |
| Date | |

**CERTIFICATE**

I hereby attest and certify this date that the foregoing document is a full, true and correct copy of the original on file in my office, and in my legal custody.

Clerk, U.S. District Court

By _____

| _____ | Deputy Clerk |
| Filed Date | |

**FOR U.S. PROBATION OFFICE USE ONLY**

Upon a finding of violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

(Signed) _____        _____
          Defendant                                    Date


_____        _____
U. S. Probation Officer/Designated Witness        Date

# EXHIBIT B

UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

- - -

HONORABLE CHRISTINA A. SNYDER
UNITED STATES DISTRICT JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,            )
                                     )
            PLAINTIFF,               )
                                     )
VS.                                  )   CASE NO:
                                     )   SA CR 14-173-CAS
KEITH PRESTON GARTENLAUB,            )
                                     )
            DEFENDANT.               )
                                     )
_____    )


REPORTER'S TRANSCRIPT OF PROCEEDINGS

MONDAY, AUGUST 29, 2016

LOS ANGELES, CALIFORNIA


LAURA MILLER ELIAS, CSR 10019
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 453
LOS ANGELES, CALIFORNIA 90012
PH:  (213)620-0890

UNITED STATES DISTRICT COURT

APPEARANCES OF COUNSEL:

ON BEHALF OF PLAINTIFF:

BY:  ANTHONY LEWIS
     VICKI CHOU
ASSISTANT UNITED STATES ATTORNEY

1100 UNITED STATES COURTHOUSE
312 NORTH SPRING STREET
LOS ANGELES, CA 90012

ON BEHALF OF DEFENDANT:

WERKSMAN JACKSON
BY:  MARK WERKSMAN, ESQ.

888 WEST SIXTH STREET
FOURTH FLOOR
LOS ANGELES, CA 90017

INDEX

PROCEEDINGS                                    PAGE

SENTENCING                                       4

LOS ANGELES, CALIFORNIA; MONDAY, AUGUST 29, 2016; 1:07 P.M.

- - -

THE CLERK: Calling Calendar Item No. 12.

Case No. SA CR 14-173.

United States of America versus Keith Preston Gartenlaub.

Counsel, please state your appearances.

MR. LEWIS: Good afternoon, Your Honor. Anthony Lewis and Vicki Chou for the United States.

THE COURT: Good afternoon.

MR. WERKSMAN: Good afternoon, Your Honor. Mark Werksman appearing on behalf of Mr. Gartenlaub who is present in court.

THE COURT: Good afternoon.

All right. Let me just review what the preliminaries are. Tell you at least my preliminary thinking on this matter. First of all, it appears that the presentence report was initially disclosed in, I guess, March of this year and the Court has reviewed -- March 4th was the date it was initially prepared.

The Court has reviewed the presentence report, the addendum to the presentence report, the second addendum to the presentence report. Mr. Gartenlaub's position regarding sentencing, Mr. Gartenlaub's objections to the PSR. The government's response and also the government's position

regarding sentencing.

I think the major change that has occurred here is my order of August 1st where I vacated the conviction for receipt of child pornography. I'm not gonna go back and review that. I think my reasons are stated in the order.

And given that decision, it does seem that the advisory range in this case has changed and that's why we have the revised position from probation where the Offense Level is now 33 with Criminal History Category of one and an advisory range of 87 to 108 months.

I believe the probation has argued for 98 months. I think the government concurs with that, but I'm not clear. I assume -- I have not seen a paper from you Mr. Werksman, and it may be we need more briefing before I can actually complete this proceeding, but I will just give you my preliminary thoughts and then let you argue and, obviously, I'm gonna want to hear from Mr. Gartenlaub.

This is not like any other case that one is going to find. Viewed as a possession of child pornography case, and I know there is a victim and I want to go back to the issue of the victim and restitution, but the thing as I noted in my earlier order that makes this case unique is that there doesn't seem to have been any addition to the collection of child pornography from the time it was first assembled back in approximately 2004. And that's a very unusual set of

circumstances.

At trial I believe that the defense forensic expert Mr. Fishbach said there was no evidence that child pornography was ever seen by anyone who used the computer much less Mr. Gartenlaub. And the government's forensic expert Mr. Pixley said he could not find any evidence of the material being downloaded on to any of the computers and so we have a particularly unusual case.

Secondly, it is not simply child pornography that was on the files. It was adult pornography which differentiates the case from the cases contemplated by the Guidelines. Mr. Gartenlaub has been in a recovery program, if you will, and so far has performed very successfully.

So that is, I think if you view this simply as a child pornography case, I think that there is a basis for a substantial variance from the sentence that was suggested by probation and the government. And frankly, I'm not sure where I want to come out, but I think something in the range of 42 to 48 months is probably where I'm leaning after having agonized over this for a long period of time.

There is the other factor and I'm not sure that it's particularly relevant, but I'm gonna recite it anyway. Obviously, the Su Bin was related to this case. The government chose to prosecute Mr. Gartenlaub on the possession of child pornography case and that is the

government's right to do, but I still have to, I think, give some consideration to the fact that Mr. Su Bin who plead guilty to espionage charge was sentenced to less than 60 months in the prison. I think it was 46 or 48 months and I'm not suggesting that the case is comparable or that it is to be considered in terms of 3553(A), but I think I have to note that there is a case that's deemed to be related to this case.

And even though the charges are entirely different in this case and provide no basis for comparison in terms of the charges between Mr. Gartenlaub and Mr. Su Bin, I still have to note that Mr. Su Bin was sentenced to a term that was substantially less based on the charges brought against him.

I don't think it makes much difference because if I'm looking at Mr. Gartenlaub and applying what I think are the appropriate standards, namely, no subsequent possession of child pornography, an attempt to rehabilitate and whatever else, I would make the variance even if I were standing with only Mr. Gartenlaub's case before me and no knowledge of Mr. Su Bin's case.

So I just think that this is a remarkably difficult case. I don't think there is anything comparable to this case. It is a one-of-a-kind case, but on the other hand, there are victims. There are people who have obviously suffered as a result of the child pornography in this case

and that is something that I have to take into account.

I'm not sure I understand the government's position on restitution at this point because, obviously, there is a request for about a million dollars in restitution. And I'm not quite clear from the government's restitution memorandum that I know where we stand on that issue.

But I think there are a lot of questions to be answered and maybe they can be answered in the course of oral argument today, but it may be that the Court is going to ask for further briefing also. So that is just my preliminary overview of where I start out today and I welcome comments from anyone.

MR. WERKSMAN: May I be heard, Your Honor?

THE COURT: Sure.

MR. WERKSMAN: Your Honor, the Court is correct to be concerned, troubled, circumspect about this case. It is unique. It's unique not only because the collection of child pornography attributed to Mr. Gartenlaub was allegedly, and he's denying this to this day.

THE COURT: I know that.

MR. WERKSMAN: Allegedly downloaded into a computer within his possession from an unknown source. And to this day, the government's own expert called it an unknown source. So there's a collection of pornography that's put on his computers between 2002 and 2005 and it's not expanded,

And then in turn, the language that the authorization for the probation officer to disclose the presentence report to the substance abuse treatment provider, that provision should be stricken at the end. No, I think that stays because there is a treatment provider unrelated to alcohol and drugs so let's leave that in.

Okay. Then I guess notwithstanding those exclusions from the order, the Court directs the BOP to evaluate Mr. Gartenlaub to see if he's eligible for the BOP's 500-hour drug and alcohol program, but I leave that to the discretion of BOP.

Mr. Gartenlaub, I'm going to talk about surrender in a minute so let's do that first, but, obviously, I know you intend to appeal from this sentence and you must do so within 14 days of today. And if you cannot afford to pay for counsel, counsel will be provided for you.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Okay. Mr. Werksman, what do we want to do about surrender here?

MR. LEWIS: Your Honor, I would request the Court grant him bail pending appeal. He has been out on 325,000 bond.

THE COURT REPORTER: I'm sorry, counsel. I can't hear you over there.

MR. LEWIS: Would the Court consider releasing him? Would Your Honor consider this a motion for bail pending appeal? He's had no problems. He's never missed a court appearance. It's been two years. He's on a $325,000 appearance bond. This case presents all the appropriate issues for 9th Circuit review. He's been very responsible in the way he's dealt with this entire case. Now, I request that the Court allow him to remain on bond pending appeal.

THE COURT: I think we may have to have a separate hearing on that because I think what the government's going to say is that there is a risk of flight.

MR. LEWIS: There is a risk of flight, but, Your Honor, there are also specific statutory factors that there must either be a substantial question of law or fact resulting in a reversal, new trial.

THE COURT: It falls under a presumption.

MR. LEWIS: A and B, Your Honor.

THE COURT: That may be the problem, Mr. Werksman. I don't think I can make the findings there's a substantial chance of reversal. You know, obviously, a court may disagree with me. I think I can't make the findings. I didn't realize we were going to fall under provision. But if you need an extended period to surrender, I'm prepared to entertain that.

MR. WERKSMAN: Would Your Honor allow him 60 days

to surrender so he can begin working with appellate counsel?

THE COURT: Yes.

MR. LEWIS: No objection, Your Honor.

MR. WERKSMAN: While we're dealing with the housekeeping matters, would the Court please recommend that he be housed in Southern California.

THE COURT: Yes.

MR. WERKSMAN: And also, Your Honor, his cousin Lyle is in court today. His son is being Bar Mitzvah'd this weekend in Bakersfield, which is in the Eastern District of California. Would the Court allow Mr. Gartenlaub to attend?

He'll be with family from this Friday, which is September 2nd through Sunday, September 5th. As long as he gives Pretrial Services his itinerary and whereabouts and he'll be in the company of family members.

THE COURT: I have no objection to that. My only point is let's be sure are we out of the land of Pretrial Services and into the land of Probation, that's my only question. I think you've got to go talk to Probation. You can represent that I will support his being able to attend the Bar Mitzvah.

MR. WERKSMAN: Thank you, Your Honor.

THE COURT: Let's find out does the government object?

MR. LEWIS: The government does not object assuming

it's by ground transportation to get there.

MR. WERKSMAN:  Yes, it would be.  He'd drive.

THE COURT:  I don't know how else you get to Bakersfield.  Ms. Jeang who is ever helpful suggests that maybe you should submit a proposed order.

MR. WERKSMAN:  I'll do that.  Thank you, Your Honor.

THE COURT:  Okay.  Anything further for now everyone?

MR. WERKSMAN:  No, Your Honor.  We just need the Court to give us a surrender date.

THE COURT:  What about October 31st at noon?

MR. WERKSMAN:  That's fine, Your Honor.  Thank you.

THE COURT:  Ms. Jeang was wanting me to clear, I had stricken Condition No. 5 which goes to mental health treatment.  I'm not sure maybe we should be striking that. We should only be striking 3 and 4 or amending it so it says costs of defendant's mental health treatment rather than substance abuse and mental health.

MR. LEWIS:  Government agrees with that.

THE COURT:  Okay.

MR. WERKSMAN:  That's fine, Your Honor.

Last question.  Would the Court grant him any pre-custody credit based upon his two years of home detention?

# EXHIBIT D

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

HONORABLE CHRISTINA A. SNYDER

UNITED STATES DISTRICT JUDGE PRESIDING

- - -

United States of America,          )
                    PLAINTIFF,     )
                                   )
VS.                                )   NO. CR 14–173 CAS
                                   )
Keith Gartenlaub,                  )
                    DEFENDANT,     )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

THURSDAY, DECEMBER 10, 2015


_____

KATIE E. THIBODEAUX, CSR 9858
U.S. Official Court Reporter
312 North Spring Street, #436
Los Angeles, California 90012


UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

APPEARANCES OF COUNSEL:


ON BEHALF OF THE PLAINTIFF, UNITED STATES OF AMERICA:

                     U.S. DEPARTMENT OF JUSTICE
                     U.S. ATTORNEY'S OFFICE
                     BY:  ANTHONY LEWIS, AUSA
                     -and- VICKI CHOU, AUSA
                     312 North Spring Street
                     Twelfth Floor
                     Los Angeles, CA  90012


ON BEHALF OF THE DEFENDANT:

                     WERKSMAN JACKSON HATHAWAY AND QUINN
                     BY:  MARK J. WERKSMAN
                     888 West Sixth Street
                     Fourth Floor
                     Los Angeles, CA 90017

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

THE COURT:  All right.

And I assume -- yes.  Go ahead.

MS. CHOU:  I was going to inquire of your Honor as to bond because the statute does require clear and convincing evidence that he is not going to be a flight risk or a danger to the community.  The government does not -- the government's position would be that he cannot prove by clear and convincing evidence that he is not a flight risk.  He had substantial travel to China in the last year.  He still has ties to China.  And so we would ask if the court is going to leave him out on bond to set forth the basis upon the record.

THE COURT:  Okay.  Well, I am not sure.  Again, we are having microphone problems.  But you want the existing bond to remain in place?

MS. CHOU:  We would seek remand, your Honor.

We believe that he is a flight risk now that he has been convicted.  He has past travel and ties to China which is a non extradition country.  That is why the specific country is relevant.

THE COURT:  Yes.

MR. WERKSMAN:  Your Honor, he has never been late for court.  He has never missed court.  He has been very responsible throughout these proceedings.  He has been on the most intensive form of pretrial supervision.  The

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

court even allowed him some additional liberty during this week all the while knowing full well that it was possible he could be convicted and face federal prison terms as a result of these charges.

I think he has more than demonstrated by his behavior that he is not a flight risk and certainly not a danger to the community under the present terms and conditions of release.

THE COURT: Yes. I am inclined to agree. I don't know because I haven't looked. Does the presumption of remand apply here? That is my only concern.

MS. CHOU: This is under 3143(a).

THE COURT: Yes.

MS. CHOU: And so it is -- the judicial officer shall order that he be detained unless the judicial officer finds by clear and convincing evidence that a person is not likely to flee or pose a danger to the safety of any other person or the community.

THE COURT: I am of the mind from what I have seen that he is not likely to flee, that he is not going to pose a danger to the community. I gather passports have already been surrendered.

MR. WERKSMAN: Yes. Long ago, your Honor, at the outset of the case.

THE COURT: So I don't believe there is a risk of

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

flight.  But obviously, to put it mildly, it would not be a good thing for Mr. Gartenlaub if he were to flee because of consequences that would fall.  So.

MS. CHOU:  Thank you, your Honor.

THE COURT:  Thank you.

MR. WERKSMAN:  Your Honor, can I just be clear about the verdict because the court read it, and I haven't seen it.  But it was for the attempted receipt; is that correct?

THE COURT:  Give me the verdict back.  There were two -- there was a verdict for possession and one for attempted.

MR. WERKSMAN:  That is what I thought.

THE COURT:  Yes.

MR. WERKSMAN:  The attempted not for an actual receipt.

MS. CHOU:  I don't believe the verdict required that they distinguish it.  It was just a "yes" or "no" on the Count 1.

MR. WERKSMAN:  Okay.  Can your Honor --

THE COURT:  We will make a copy for you.

MR. WERKSMAN:  Okay.  Thank you.

THE COURT:  I think that I did require them to separate the jury instruction out for clarity, but I don't think it was required by the verdict form or by the

nature of the offense.  But she will make a copy of the verdict form for you so you have it.

MR. WERKSMAN:  Thank you.

THE COURT:  Thank you.

(Proceedings concluded.)

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**CERTIFICATE OF SERVICE**

I hereby certify that on January 27, 2017, I electronically filed the foregoing with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

By: *  /s/Tor Ekeland*
Tor Ekeland
TOR EKELAND, P.C.
43 West 43d Street
Suite 50
New York, NY 10036
Tel: 718-737-7264
Fax: 718-504-5417
tor@torekeland.com